UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE DIVISION

ATLANTIC MARINE FLORIDA, LLC
A/S/I ATLANTIC MARINE, INC., and
AMERICAN HOME ASSURANCE COMPANY
as subrogated underwriter,

    Plaintiffs,

v.                                    Case No.: 3:08-cv-538-HES-TEM

EVANSTON INSURANCE COMPANY and
HARTFORD CASUALTY INSURANCE
COMPANY
    Defendants.

## ORDER

Before the Court are the Parties' Cross Motions for Summary Judgment (Docs. 26, 38, 39, and 67) and Responses (Docs. 33, 56, 67, and 73). The Court has considered the Motions before it and determined the following.

### I. Introduction

Atlantic Marine Florida, LLC, a/s/i Atlantic Marine, Inc., ("AMI"), American Home Assurance Company ("AMC") (collectively "Plaintiffs"), Evanston Insurance Company ("Evanston"), and Hartford Casualty Insurance Company ("Hartford") (collectively "Defendants")have filed Cross Motions for Summary Judgment. Plaintiffs allege that Defendants failed to defend or indemnify them in the Beverly Litigation, which stemmed from an injury aboard the vessel "Cape May Light" when the boat's captain was killed by a negligently constructed and designed Watertight Door System. Defendants claim that Plaintiffs are not named insureds under either of their policies and, as a result, they had no duty to defend nor indemnify the Plaintiffs in the

underlying action.

## II. Statement of Facts[1]

In April 1998, the architect and engineering firm Guido Perla & Associates ("GPA") began design and engineering services for two passenger vessels on behalf of the Delta Queen Steamboat Co; the contract was later assigned to Coastal Queen Holdings, LLC ("Coastal Queen"). In May 1999, AMI contracted with Coastal Queen to construct the passenger vessels. As part of its obligation under the construction contract with Coastal Queen, AMI employed GPA to continue its design and engineering services for the two ships, one which would be named "Cape May Light." On January 12, 2000, AMI and GPA reduced their contract to writing (the "Agreement"); however, GPA had prepared some or all of its design drawings before the execution of the Agreement.

As part of the Agreement, AMI required that GPA obtain various insurance policies, including an Architect's and Engineers Policy (the "AE Policy") issued by Defendant Evanston and a Comprehensive General Liability Insurance Policy (the "CGL Policy") issued by an insurer selected by GPA. Additionally, Paragraph 2 of the Agreement, entitled "Scope of Work," required that "GPA [ ] provide and perform all of the design and engineering services necessary for the complete performance of the work . . . . GPA agrees that it is obligated to provide the professional services under this Agreement in a manner that is consistent with all appropriate professional standards." (Agreement, ¶ 2, p. 2). The Agreement further provided in paragraphs 8(a)(2) and (4), that the CGL Policy was to be, "for not less than $2,000,000.00" and the AE Policy was for "limits not less than $5,000,000.00." Finally, in paragraph 9(a), AMI limited its liability as follows:

---

[1]This Court's use of the word "facts" is solely for purposes of deciding the Motions before it. *Kelly v. Curtis*, 21 F.3d 1544, 1546 (11th Cir. 1994) (citation omitted).

2

> In the event that AMI makes a claim, enters into a settlement or obtains a judgment against GPA for professional negligence and/or professional errors and omissions, AMI agrees that its recourse will be limited to and it will not execute such a claim, settlement or judgment against any assets of GPA other than the Architect's and Engineer's Professional Liability Insurance policy . . . . GPA agrees to provide all notices required by such policy and to cooperate with AMI so as to enable AMI to obtain coverage for claims relating to or arising out of GPA's professional negligence and/or professional errors and omission under such Architect's and Engineer's Professional Liability Insurance.

Under the Agreement, GPA was designated the Named Insured under AE policy, but AMI paid the premium for the AE Policy directly to Evantson. Evanston agreed to a number of specific endorsements to the AE policy, including Nos. 7, 10 and 11. Endorsement No. 7 states, "[Evanston] shall not settle any Claim without the consent of AMI." Endorsement No. 10 reads,

> In consideration of the premium charged, it is understood and agreed that Exclusions I. is deleted in its entirety and replaced by the following: Liability assumed by the Named Insured by agreement, whether written or oral, including, but not limited to hold harmless and indemnity clauses, warranties, guarantees, certifications or penalty clauses, unless such liability arises from error, omissions or negligent acts of the Insured and would have attached in the absence of such agreement. However, this exclusion shall not apply to liability of the Named Insured for a breach of the express contract described below, but only to the extent that the liability is the result of an act, error, or omission of the Named Insured arising out of the professional services described in the Declarations.

Listed under the "Description of the Contract" is "Coastal Queen Project/Design of two passenger cruise ships."

Finally, No. 11 reads

> In consideration of the premium charged, such insurance as is afforded by this policy applies to the liability of other imposed by law, which is assumed by [GPA] under the contract described below, but only to the extent that the liability of others is the result of an act, error, omission of [GPA] arising out of the professional services described in the Declarations.

AMI eventually paid approximately $193,950.00 in premiums to Evanston over the life of the AE Policy.

3

In addition to the purchase of the AE Policy, the Agreement mandated that GPA purchase comprehensive general liability insurance. (Agreement, ¶8(a)(2)). The provision required that the CGL Policy, "cover AMI as an additional insured and the Policy shall contain the following language 'Naming AMI as an additional insured shall not prevent recovery in any situation in which recovery would have been available had AMI not been named an additional insured.'" *Id.* Though GPA did procure comprehensive general liability insurance from Defendant Hartford, it failed to add AMI as a named insured or include the required language.

In October 2007, while "Cape May Light" was berthed at Green Cove Springs Shipyards in Clay County, Florida, its Captain, Charles Beverly ("Captain Beverly") died when a watertight door closed on him. Captain Beverly's widow brought suit against both AMI and GPA for wrongful death (the "Beverly Litigation") alleging, *inter alia*, negligence and strict liability against each Defendant. AMI tendered its defense to Evanston and Hartford; however, both companies refused to defend or indemnify AMI under their policies with GPA. Evanston provided GPA with a defense to the Beverly Litigation for approximately $300,000.00. In July 2007, AMI paid $325,000.00 to the Beverly estate to settle its portion of the Beverly Litigation. During the settlement negotiations, AMI also incurred attorneys' fees and costs. AMI brings the instant action against both Evanston and Hartford for reimbursements of the settlement paid and fees and costs incurred during the Beverly Litigation. All parties have filed cross motions for summary judgment, arguing that the case primarily involves contract construction and there exists no genuine dispute as to any material fact.

### III. Standard of Review

Under Fed. R. Civ. P 56(a), "A party claiming relief may move, with or without supporting affidavits, for summary judgment on all or part of the claim." Summary judgment is proper if

4

following discovery, the pleadings, depositions, answers to interrogatories, affidavits, and admissions on file show that there is no genuine issue as to any material fact in dispute and that the moving party is entitled to judgment as a matter of law. *Celotex Corp. v. Catrett*, 477 U.S. 317 (1986); Fed. R. Civ. P. 56. The movant "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact." *Celotex*, 477 U.S. at 323 (internal quotations omitted).

This Court recognizes that it may not decide genuine factual disputes at the summary judgment stage. *Fernandez v. Bankers Nat'l Life Ins. Co.*, 906 F.2d 559, 564 (11th Cir. 1990). A dispute about a material fact is genuine, and summary judgment is inappropriate, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. *Haves v. City of Miami*, 52 F.3d 918, 921 (11th Cir. 1995). The district court must view all evidence most favorably toward the nonmoving party, and all justifiable inferences are to be drawn in the nonmoving party's favor. *Whatley v. CNA Ins. Cos.*, 189 F.3d 1310, 1313 (11th Cir. 1999). If the district court finds, under the relevant standards, that a disputed factual issue exists, summary judgment should be denied.

### IV. Discussion

A. Choice of Law and Contract Construction

The issue before this Court on summary judgment is whether Defendants Evanston and Hartford had a duty to defend or indemnify Plaintiffs in the Beverly Litigation. This Court has jurisdiction over this matter pursuant to 28 U.S.C. §1332 in that the Parties are diverse and the

5

amount in controversy is greater than $75,000.00. When a court exercises jurisdiction based on diversity of citizenship, it must apply the choice of law rules of the forum state to determine which substantive law governs the action. *U.S. Fidelity & Guar. Co. v. Liberty Surplus Ins. Corp.*, 550 F.3d 1031, 1033 (11th Cir. 2008). The Parties do not dispute that Florida law governs the meaning of the Policies and their application to the facts of this case.

Under the laws of Florida, "insurance contracts are construed according to their plain meaning. Ambiguities are construed against the insurer and in favor of coverage." *Garcia v. Federal Ins. Co.*, 969 So.2d 288, 291 (Fla. 2007); *Taurus Holdings, Inc. v. U.S. Fidelity and Guar. Co.*, 913 So.2d 528, 532 (Fla. 2005). Further, "although ambiguous provisions are construed in favor of coverage, to allow for such construction the provisions must actually be ambiguous." *Id.* Courts are not permitted to, "rewrite contracts, add meaning that is not present, or otherwise reach results contrary to the intention of the parties." *Id.*

However, Courts only look to these rules of construction where there is "a genuine inconsistency, uncertainty, or ambiguity in meaning remains" after using the ordinary rules of construction. *State Farm Mut. Auto. Ins. Co v. Pridgen*, 498 So.2d 1245, 1248 (Fla. 1986). Thus, a court must always begin with a, "review of the plain language of the insurance policy as bargained for by the parties." *Koikos v. Travelers Ins. Co.*, 849 So.2d 263, 266 (Fla. 2003). Further, "if a policy term is clear and unambiguous, it should be enforced according to its terms whether it is a basic policy provision or an exclusionary provision." *Taurus Holdings*, 913 So.2d at 532. It is well established that an insurer, as the writer of an insurance policy, is bound by the language of the policy, which is to be construed liberally in favor of the insured and strictly against the insurer. *Id.* Finally, when construing an insurance contract to determine whether coverage exists, the provisions

of the contract should be read *in pari materia*. *State Farm Fire & Cas. Co. v. CTC Dev. Corp.*, 720 So.2d 1072, 1075 (Fla. 1998)(reasoning that "every insurance contract shall be construed according to the entirety of its terms and conditions as set forth in the policy")(quoting *Nationwide Mut. Fire Ins. Co. v. Olah*, 662 So.2d 980, 982 (Fla. 2d DCA 1995)).

### B. Plaintiffs' and Defendant Evanston's Cross Motions for Summary Judgment

Plaintiffs argue that they are entitled to summary judgment because Evanston failed to defend or indemnify them in the Beverly Litigation. In support of its Motion, Plaintiff argues that 1) Evanston breached the AE Policy when it failed to obtain AMI's consent to the settlement made on behalf of GPA and 2) it is a third party beneficiary under the AE Policy and was inappropriately denied coverage. Evanston argues that it is entitled summary judgment because Plaintiff is not a beneficiary under the AE Policy. Though Evanston does acknowledge that it failed to obtain Plaintiff's consent for the settlement in the Beverly Litigation, it maintains this an inappropriate basis for recovery as Plaintiffs are unable to identify damages as a result of that breach.

*1) Evanston's Failure to obtain Plaintiffs' consent for settlement on behalf of GPA in the Beverly Litigation*

Evanston admits that it failed to obtain the Plaintiffs' consent to the GPA settlement in the Beverly Litigation as required by the AE Policy (Evanston's Resp., Doc. 56, p.17). However, they are correct in arguing that this fact, alone, is not enough for Plaintiffs to succeed on their motion for summary judgment in its entirety. The language in Endorsement No. 7 of the AE Policy reads:

> [Evanston] shall not settle any Claim without the consent of the Atlantic Marine Holding Company. If, however, the Atlantic Marine Holding Company shall refuse to consent to any settlement recommended by the Company and shall elect to contest the Claim or continue any legal proceedings in connection with such Claim, then the Liability of the Company or such Claim shall not exceed the sum of (1) the amount for which such Claim could have been settled plus (2) Claims Expenses incurred up

to the date of such refusal.

Based on the language of the Endorsement, it would be difficult for Plaintiffs to prove that they sustained any damages from Evanston's failure to obtain consent for settlement. As Evantson notes, all that withholding consent would have accomplished would have been to expose GPA to a potential judgment in excess of the settlement amount and caused GPA to incur attorneys fees beyond what they would have been entitled to recover under the AE Policy. Further, had Plaintiff withheld its consent, Evanston still would have been obligated to settle any claim that it deemed in the insured's best interest.

*2) Plaintiffs are a third party beneficiary of the AE Policy*

The following elements are required for a cause of action for breach of a third party beneficiary contract in Florida: 1) a contract between A and B; 2) the clear or manifest intent of A and B that the contract primarily and directly benefit the third party; 3) breach of the contract by A or B; and 4) damages to the third-party resulting from the breach.[2] *Foundation Health v. Westside EKG Associates*, 944 So.2d 188, 194-95 (Fla. 2006). It is important to note that the third party need not be mentioned by name in the contract to be deemed a third party beneficiary. *Polo Ralph Lauren, L.P. v. Tropical Shippong & Const. Co., Ltd.,* 215 F.3d 1217, 1222 (11th Cir. 2000).

All the requirements for third party beneficiary status are satisfied. First, the contract at issue here is the AE Policy between Evanston and GPA. To be successful in the second prong of the test, Plaintiffs must show that the contract between Evanston and GPA was entered into to directly benefit

---

[2] Plaintiffs argue, *inter alia*, that they are a third party beneficiary under the AE Policy. As this Court determines that Plaintiffs satisfy the requirements of a third party beneficiary under Florida law, it will not address the intended beneficiary and "insured contract" arguments set forth in the Parties' briefs.

8

AMI,

> [t]he question of whether a contract was intended to benefit of a third person is generally regarded as one of construction of contract. The intention of the parties in this respect is determined by the terms of the contract as a whole, construed in the light of the circumstances under which it was made and the apparent purpose that the parities are trying to accomplish.

*Moyer v. Graham*, 285 So.2d 397, 402 (Fla. 1973)(citations omitted). When considering the language of the AE Policy and its construction, the parties intended that AMI directly benefit from the AE Policy. Plaintiffs negotiated specific endorsements to the AE Policy when contracting with Evanston, including Nos 10 and 11. They read, in pertinent part:

> In consideration of the premium charged, it is understood and agreed that Exclusions I. is deleted in its entirety and replaced by the following: Liability assumed by the Named Insured by agreement, whether written or oral, including, but not limited to hold harmless and indemnity clauses, warranties, guarantees, certifications or penalty clauses, unless such liability arises from error, omissions or negligent acts of the Insured and would have attached in the absence of such agreement. However, this exclusion shall not apply to liability of the Named Insured for a breach of the express contract described below, but only to the extent that the liability is the result of an act, error, or omission of the Named Insured arising out of the professional services described in the Declarations.
>
> * * * * * * * * * * * * *
>
> In consideration of the premium charged, such insurance as is afforded by this policy applies to the liability of others imposed by law, which is assumed by [GPA] under the contract described below, but only to the extent that the liability of others is the result of an act, error, omission of [GPA] arising out of the professional services described in the Declarations.

These endorsements supplanted original language in the AE Policy that addressed exclusions and contractual liability. These endorsements modified the Agreement between Plaintiffs and GPA, as the "description of the contract" listed at the bottom of the endorsements pages read, "Coastal Queen Project/Design of two passenger cruise ships" and "contracts entered into by [GPA] with a client in the furtherance of the Professional activities specified in the Declarations." (AE Policy,

9

Endorsements Nos. 10 and 11, respectively).

These endorsements explicitly extend coverage to AMI as the manufacturer of the "Cape May Light" in the instant circumstances. In the Beverly Complaint, the plaintiffs alleged that AMI was liable as a result of an error by GPA that arose out of the professional services described in the Agreement. The Beverly Complaint averred that the Watertight Door System was designed and manufactured in such a way that allowed it to close on Captain Beverly. (See Compl., Doc. 1, Exhibit "D", at p. 10-15). Plaintiffs specifically negotiated with Evanston for Endorsement Nos. 10 and 11 to include language that both directly and indirectly incorporated the Agreement between AMI and GPA into the AE Policy.

Additionally, AMI paid the AE Policy premium, negotiated the right to cancel or extend the AE Policy term, had control over whether to report a claim, and maintained the power over whether to approve any settlement or claim under the AE Policy. This Court fails to grasp a logical reason that Plaintiffs would pay the premium and contract with Evanston to retain other controls over the AE Policy, unless it intended to insure its own liability stemming from a potential breach of professional services by GPA. Moreover, as Plaintiffs note, AMI is not a professional architect nor engineer, and therefore would not qualify as a named insured under the AE Policy; however, the record supports that it was "GPAs and AMIs intention in drafting the Agreement and procuring the [AE] Policy to transfer the risk of liability arising from GPA's error or omission in failing to render the contracted engineering services in a manner consistent with 'all appropriate professional standards'" as required by the Agreement. (Pls' Res. in Opp., Doc. 33, at 4-5).

*3) Evanston had a duty to defend Plaintiffs in the Beverly Litigation*

Having determined that AMI was a beneficiary under the AE Policy, this Court turns to

whether Evanston had the duty to defend Plaintiffs in the Beverly Litigation. The duty to defend is of greater breadth than the insurer's duty to indemnify, and the insurer must defend even if the allegations in the complaint are factually incorrect or meritless. *Jones v. Florida Ins. Guar Ass'n, Inc.*, 908 So.2d 435, 443 (Fla. 2005). The law is well-settled that the duty of an insurance carrier to defend a claim falling within its insurance contract depends solely on the allegations in the complaint. *Tropical Park, Inc. v. U.S. Fid. & Guar. Co.*, 357 So.2d 253, 256 (Fla. 3d DCA 1978). Further, "the duty is determined solely by the allegations against the insured, not by the actual facts, nor the insured's version of the facts." *Irvine v. Prudential Prop. & Cas. Ins. Co.*, 630 So.2d 579, 579-80 (Fla. 3d DCA 1993). Any doubts regarding the duty to defend must be resolved in favor of the insured. *Grissom v. Commercial Union Ins. Co.*, 610 So.2d 1299, 1307 (Fla. 1st DCA 1992).

In the Beverly Litigation, Captain Beverly's widow alleged that both AMI and GPA were liable under theories of negligence and strict liability for the design, manufacture, and installation of the Watertight Door System aboard the "Cape May Light." These allegations stemmed, in part, from GPA's failure to perform its architectural and engineering services, "consistent with all appropriate professional standards," as required by the Agreement (Agreement, ¶2 (a)). As AMI is a third party beneficiary under the AE Policy, Evantson's duty to defend was triggered. Though some of the Beverly Complaint's allegations fell outside of the scope of the AE Policy, Evanston's duty to defend encompassed the entire suit. *See id.* Since Evanston breached the AE Policy when it failed to defend Plaintiffs in the Beverly Litigation and Plaintiffs incurred liability in the amount of $325,000.00 and attorneys' fees, Plaintiffs are entitled to summary judgment as a matter of law.

11

## C. Plaintiffs' and Defendant Hartford's Cross Motions for Summary Judgment

Plaintiffs also maintain that they are entitled to summary judgment against GPA's general liability insurance provider Defendant Hartford. In the Agreement, GPA contracted to procure comprehensive general liability insurance with limits of not less than $2,000,000.00. The Agreement required, "such insurance must cover AMI as an additional insured." (Agreement, ¶ 8(2)). GPA failed to add AMI an additional insured under the CGL Policy with Hartford. Plaintiffs assert that regardless of GPA's omission, Hartford had a duty to defend or indemnify Plaintiffs in the Beverly Litigation. Hartford argues that Plaintiffs were not a Named Insured under the CGL Policy and, alternatively, that type of injury that occurred in the Beverly Litigation, which resulted from GPA's professional negligence, is excluded from the CGL Policy.

*1) Plaintiffs are additional insureds under the CGL Policy*

The CGL Policy details who are covered in several different sections of the Policy. The Named Insured is listed on the first page of the CGL Policy as "Guido Perla & Associates, Inc." (CGL Policy, p. 1). Further, the CGL Policy, under the business Liability Coverage Form, provides coverage as follows:

> **C. Who is an Insured** ... 2. Each of the following is also an insured ... f. Additional insured by contract Agreement or Permit: Any person or organization with whom you agree, because of a written contract or agreement or permit, to provide insurance such as is afforded under this Business Liability Coverage Form, but only with the respect to your operation, "your work" or facilities owned by you.
>
> **G. Liability and Medical Expenses Definitions** ... 10. "Insured contract" means... f. that part of any other contract or agreement pertaining to your business .. under which you assume the liability fo another party to pay for "bodily injury" or property damage to a third person. Paragraph f. does not include that part of any contract of agreement (1) that indemnifies an architect engineer or surveyor for injury arising out of (a) preparing approving or failing to approve maps, shop drawing, opinions, reports and surveys, field order change orders or drawings and specifications; or (b) giving directions, instructions, or failing to give them, if that is

> the primary cause of the injury or damage; (2) under which [GPA], if an architect, engineer or surveyor, assumes liability for an injury or damage arising out of the insured's rendering of or failure to render professional services... 22. "Your Work" means ... (a) work or operations performed by you or on your behalf; and (b) materials parts or equipment furnished in connection with such work or operations. "Your Work" includes (a) warranties or representations made at any time with respect to the fitness, quality, durability, performance or use of "your work"; and (b) the providing of or failure to provide warning or instruction.

(CGL Policy, p. 10-11, 18-21, respectively).

Though GPA contracted to insure AMI in the Agreement, it failed to add AMI as an additional insured to the policy. Therefore, based on the reasoning set forth in the "Who is Insured" section of the Policy, the only way that AMI could be insured is 1) if there was an agreement between Plaintiffs and GPA requiring that Plaintiffs be insured under the CGL Policy and 2) if Plaintiffs were sued for "work" performed by GPA. (See CGL Policy, p. 10-11). It is undisputed that the Agreement required GPA to name AMI as an additional insured. AMI and GPA agreed that GPA would add AMI as an insured to their CGL Policy; GPA failed to do so. Thus, AMI is not a Named Insured under the CGL Policy, but an additional insured for certain professional and engineering services performed by GPA.[3] (See CGL Policy, Section C(2)(f)).

The issue now becomes whether the Beverly Complaint sued AMI for "work" performed by GPA. The Beverly Complaint alleged that AMI was liable under theories of strict liability and negligence, as the Watertight Door System, "was designed in a manner that allowed it to close on the decedent; ... was designed in such a manner that a person caught or trapped in the door could not activate a release mechanism or mechanisms to disengage or release the door ... lacked proper

---

[3] Though GPA failed to add AMI as a Named Insured on its CGL Policy, the facts do not indicate that Hartford was in any way responsible for this omission. If any action lies for that failure, it would be against GPA for its alleged breach of the Agreement.

13

warnings and/or instructions." (Beverly Complaint, ¶ 33 (a)-(k)). These allegations against AMI are indeed for "work" that was performed by GPA.

*2) CGL Policy exclusions preclude Plaintiffs' recovery*

Though Plaintiffs are additional insureds under the CGL Policy, it expressly excludes liability for bodily injury resulting from engineering services. Attached to the CGL Policy is the following endorsement, which modifies the Business Liability Coverage Form:

> **Exclusion-Engineer's and Architect's Professional Liability**: This insurance does not apply to "bodily injury," "property damage," or "personal and advertising injury" arising out of the rendering or failure to render any professional services by you, including: (1) the preparing, approving, or failing to prepare or approve maps, drawings, opinion, reports, surveys, change orders, designs or specifications; and (2) supervisory, inspection, or engineering services.

Though some of the allegations against AMI in the Beverly Complaint stemmed from work performed by GPA, the Engineer's and Architect's Professional Liability Exclusion specifically excludes coverage for "'bodily injury' . . . arising out of the rendering or failure to render any professional services . . . including . . . engineering services." Multiple courts have found that professional services exclusions bar recovery for activities performed by an insured. *Estate of Tinervin v. Nationwide Mut. Ins. Co.*, 23 So.2d 1232, 1236 (Fla. 4th DCA 2009)(affirming trial court determination that professional services exclusion applied); *Sekura v. Granada Ins. Co.*, 996 So.2d 861, 862 (Fla. 3d DCA 2005)(finding that professional services exclusion of CGL insurance policy precluded recovery for claims for defective workmanship); *Alpha Therapeutic Corp v. St. Paul Fire and Marine Ins. Co.*, 890 F.2d 368, 369-70 (11th Cir. 1989)(affirming district court's determination that medical technician's error was excluded from coverage under CGL insurance policy which contained a professional services exclusion); *QBE Ins. Corp. v. Brown & Mitchell, Inc.*, 591 F.3d 439, 444-45 (5th Cir. 2009)(holding that professional services exclusion barred recovery for personal

14

injuries). The allegations against AMI in the Beverly Complaint are for exactly the type of work unequivocally excluded in the CGL Policy–design specifications and engineering services. Therefore, Plaintiffs recovery is barred.

## V. Conclusion

Plaintiffs and GPA contracted for GPA to provide professional services in a manner consistent with appropriate professional standards in its engineering and design of two vessels, one of which was named the "Cape May Light." Tragically, Captain Beverly lost his life aboard the "Cape May Light" when a watertight door closed on him. The Beverly Litigation was settled by both GPA and AMI; however, Defendants Evanston and Hartford refused to defend or indemnify Plaintiffs. This Court finds that based on language of the Agreement between GPA and AMI and the AE Policy issued by Evanston, specifically Endorsements Nos. 10 and 11, Evanston had a duty to defend Plaintiffs in the Beverly Litigation. Plaintiffs were also an additional insured under the CGL Policy; however, the Engineer's and Architect's Liability Exclusion discharged any duty that Hartford may have had to defend or indemnify Plaintiffs in the Beverly Litigation. Hartford did insure bodily injury stemming from GPA's "work" in the CGL Policy, but specifically excepted bodily injury resulting from the "failure to render professional services, including engineering services."

Therefore, it is **ORDERED** and **ADJUDGED**:

1. Plaintiffs' Motion for Summary Judgment against Evanston (Doc. 38) is **GRANTED**.

2. Evanston's Motion for Summary Judgment against Plaintiffs (Doc. 26) is **DENIED**.

3. Plaintiffs' Motion for Summary Judgment against Hartford (Doc. 39) is **DENIED**.

4. Hartford's Motion for Summary Judgment against Plaintiffs (Doc. 67) is **GRANTED**.

5. The Clerk is directed to enter judgment in favor of Plaintiffs and against Evanston in the amount of $325,000.00. The Clerk is directed to enter judgment in favor of Hartford and against Plaintiffs in the amount of $0.00.

6. The Clerk is directed to terminate all pending motions and **CLOSE** the file.

**DONE AND ENTERED** in Jacksonville, Florida, this 22nd day of June, 2010.

HARVEY E. SCHLESINGER
United States District Judge

Copies to:

Andrew W. Anderson, Esq.
Lawrence Jacobson, Esq.
Richard Randall McCormack, Esq.
Joseph H. Lowe, Esq.
Lisa Oonk, Esq.
Stacey L. Papp, Esq.
Michael H. Kestenbaum, Esq.